Before the First Division, April 5, 1956

**No. 59805.**—Scovill Manufacturing Company *v.* United States, protest 207763–K (Bridgeport).

Oliver, Chief Judge: This protest relates to four items, described on the invoice as "Outside Shell," "Inside Shell," "Holder Shells," and "Cap," which were assessed with duty at the rate of 1 cent each and 50 per centum ad valorem under the provisions of paragraph 1527 (c) of the Tariff Act of 1930 as unfinished parts of articles provided for in that paragraph. Paragraph 1527 (c), so far as pertinent, reads as follows:

(c) Articles valued above 20 cents per dozen pieces, designed to be worn on apparel or carried on or about or attached to the person, such as and including buckles, cardcases, chains, cigar cases, cigar cutters, cigar holders, cigar lighters, cigarette cases, cigarette holders, coin holders, collar, cuff, and dress buttons, combs, match boxes, mesh bags and purses, millinery, military and hair ornaments, pins, powder cases, stamp cases, vanity cases, watch bracelets, and like articles; all the foregoing and parts thereof, finished or unfinished: * * *

Plaintiff claims that the merchandise in question is dutiable at the rate of 40 per centum ad valorem under the provisions of paragraph 1527 (d), as modified by T. D. 52739, reading as follows:

Stampings, galleries, mesh, and other materials of metal, whether or not set with glass or paste, finished or partly finished, separate or in strips or sheets, suitable for use in the manufacture of any articles provided for in paragraph 1527 (a), (b), or (c), Tariff Act of 1930:
Of gold or platinum_____ 37½% ad val.
Of other metal or metals, plated or unplated_____ 40% ad val.

One witness testified. He was the divisional sales manager of the plaintiff corporation, who ordered the merchandise under consideration. His uncontradicted testimony will support the following summary.

Official samples of the merchandise, received in evidence, were identified as follows: The "inside shell" (plaintiff's exhibit 1); the "outside shell" (plaintiff's exhibit 2); the "holder shell" (plaintiff's exhibit 3); and the "cap" (plaintiff's exhibit 4). All of them are hollow, cylindrical pieces of brass, varying in diameter

from one-half of 1 inch to nine-sixteenths of 1 inch and in length from one-half of 1 inch to 2 inches, overall. They appear to be unpolished and unfinished.

The four imported items were characterized as "common shells." They are used by plaintiff in the manufacture of two general types of containers, i. e., the straight container, and the container that "will propel and repel." The latter is the type of container which, when the base thereof is turned clockwise, propels the material or substance carried therein for use by the individual. By rotating the base counter-clockwise, the material or substance is repelled or drawn back into the container. Before they become available for use in either of the types of containers referred to, each of the items in question, subsequent to importation, is subjected to certain processes, which include the "piercing" of a slot; pressing, sizing, and "swelling" operations to obtain the desired diameter; and, finally, cleaning, polishing, and coloring. The "inside shell" (exhibit 1, *supra*) is subjected to all—12 in number—of the operations. The other items in question are subjected to many, but not all, of the same processes.

In the production of propel-and-repel containers, plaintiff uses all of the imported shells and, in addition, a fifth part identified as "the spiral." In the manufacture of straight containers, plaintiff uses one, or two, or three of the imported items, but never employs all of them.

The merchandise in question was made in Canada from plaintiff's own tools, and, after importation, it was commingled with identical shells made in this country. In other words, these shells are stock items, manufactured for plaintiff's use in the production of small metal containers that are used for various purposes. The predominant use of the shells under consideration is in lipstick holders (defendant's exhibit A), which are containers of the propel-and-repel type. Samples in evidence, showing other uses of the imported items, include container for eyeglass cleaning preparations (plaintiff's illustrative exhibit 6); container for pop-up toothbrush (plaintiff's illustrative exhibit 7); container for holy water (plaintiff's illustrative exhibit 8); perfume container (plaintiff's illustrative exhibit 9); container for bobby pins (plaintiff's illustrative exhibit 10); container in a lighter unit (plaintiff's illustrative exhibit 11); container in atomizer unit (plaintiff's illustrative exhibit 12); container for powder pencil (plaintiff's illustrative exhibit 13); container for an eyebrow pencil (plaintiff's illustrative exhibit 14); container for an iodine applicator (plaintiff's illustrative exhibit 15). There is also testimony showing additional uses for the imported merchandise as a container, with a cork as a closure, to ship "diamond point phonograph needles," and as a receptacle for holding heavy ink used with stamp pads.

The record, as hereinabove analyzed, shows that the metal shells in question are used, principally, in the manufacture of containers, designed to be carried on or about the person. The principle of "chief use," however, is not determinative of the issue before us. The provision invoked by plaintiff requires only that the merchandise shall be "*suitable for use* in the manufacture of any articles provided for in paragraph 1527 * * * (c), Tariff Act of 1930," [italics supplied] and "the term 'suitable for use' does not in the tariff sense imply or require chief use," but rather implies "a commercial suitability or fitness in the condition imported." (*United States* v. *Lorsch & Co.*, 8 Ct. Cust. Appls. 109, T. D. 37222.) The crux of the present case is whether these imported metal shells are unfinished parts, as assessed, or mere materials, as claimed.

Merchandise is classifiable under a provision for "parts" of an article when it is unserviceable for any other purpose, or incapable of any other use, than as part of a particular article or a particular class of articles. *United States* v. *Lyon & Healy*, 4 Ct. Cust. Appls. 438, T. D. 33873; *United States* v. *Schenkers, Inc.*, 17 C. C. P. A.

(Customs) 231, T. D. 43669. The *Lyon & Healy* case involved merchandise that the court described as follows:

The violin and cello necks are cut into shape, but are not polished or fitted, nor have they holes bored through them for the keys for the violin strings. They are, however, so far shaped as to indicate *per se*, as imported, their ultimate use, and that by reason of their shape and condition as imported they are unfit for any other use.

In holding such merchandise to be properly classifiable as parts of musical instruments, the appellate court stated that "Their physical construction is such as to plainly render them unserviceable for any other purpose and to clearly identify them and their future use as parts of musical instruments." The *Schenkers, Inc.*, case, *supra*, citing with approval the *Lyon & Healy* case, stated the basic principle, here under discussion, as follows:

\* \* \* where a material has been so advanced in manufacture as to have reached a stage in which it is clearly incapable of being made into more than one article, then it shall be deemed, even though unfinished, to have been so dedicated to a single use as to fix its status as a part of that article.

Directly in point is the case of *United States* v. *American Bead Co. et al.*, 9 Ct. Cust. Appls. 27, T. D. 37873. That case involved base metal snaps, clasps, and swivels that had been dipped in acid and lacquered and which were employed in the manufacture of various articles, including bead necklaces, and neck, fan, vest, and eyeglass chains. In excluding the merchandise from the provision for parts of articles provided for in paragraph 356 of the Tariff Act of 1913 (a predecessor of paragraph 1527 (c), *supra*), the court reasoned as follows:

An article not an actual constituent of a manufacture can not be considered as part thereof unless it has been advanced to a point which definitely commits it to that specific class and kind of manufacture. An article commercially suitable and commercially used for the making of different things is a material which is just as much adapted to the production of all of them as it is to the production of any one of them, and until it has been finally appropriated to some definite manufacturing use and has been given the distinguishing characteristics which clearly identify it as one of the components ultimately to be assembled into a particular completed whole, it can not be regarded as a part of any specified manufacture.

Inasmuch as the snaps, clasps, and swivels under discussion are just as applicable to the manufacture of bead necklaces as they are to the making of chains, it is evident that they are not finally committed to the manufacture of chains, and consequently it can not be said that they are "parts of chains." \* \* \* The evidence establishes that the wares are materials of metal and that as imported they are largely used and commercially suitable for the manufacture of chains designed to be worn on or about or attached to the person. As chains of that kind are specifically enumerated in paragraph 356, and as the materials suitable for making them are by that paragraph subjected to a duty of 50 per cent ad valorem, the merchandise involved in the appeal must be held to be dutiable at that rate. \* \* \*

Under all of the cited authorities, the merchandise in question is not properly classifiable as parts, "finished or unfinished," of any of the classes of articles provided for in paragraph 1527 (c), *supra*. These metal shells are not committed to articles, designed to be carried on or about the person, the general class of articles contemplated by paragraph 1527 (c). On the contrary, there is ample evidence herein—oral testimony as well as samples—showing a substantial use for these shells in various kinds of containers that are not designed to be carried on or about the person. On that phase of the record, particular attention is directed to the witness' testimony concerning the holy-water container (illustrative exhibit 8), the container for bobby pins (illustrative exhibit 10), the receptacle for heavy ink used on stamp pads, and the container for phonograph needles. The holy-water container was designed for use in homes. The container for bobby

pins was designed for use on women's dressers. The receptacle for heavy ink was designed for use on desks. The container for phonograph needles was designed for use in the shipment of "diamond point phonograph needles." The atomizer unit (illustrative exhibit 12), which includes a metal container using the imported merchandise, supports the witness' testimony to the effect that plaintiff is concentrating on the design of containers, to make them suitable for use on women's dressers in homes. All of the articles just referred to are commercial items that are manufactured and sold by plaintiff in large quantities.

Emphasis also should be made with reference to the condition, at the time of importation, of the merchandise in question. These shells, as imported, are not susceptible of any use. Each of the items requires much processing subsequent to importation to advance them to the condition where they become ready for immediate use. In their condition, as imported, the shells are mere materials of metal.

On the basis of the record before us, and for all of the reasons hereinabove set forth, we hold the merchandise in question to be classifiable under the provision for "materials of metal * * * suitable for use in the manufacture of any of the articles provided for in paragraph 1527 (a), (b), or (c), Tariff Act of 1930," in paragraph 1527 (d), as modified, *supra*, and dutiable thereunder at the rate of 40 per centum ad valorem, as claimed by plaintiff.

The protest is sustained and judgment will be rendered accordingly.